UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

UNITED STATES OF AMERICA       CRIMINAL NO. 6:11-cr-0055

VERSUS       JUDGE HAIK

MONTY MORGAN (01)       MAGISTRATE JUDGE HANNA

## FINDINGS  AND  RECOMMENDATION
## ON  MOTION  TO  SUPPRESS

Monty Morgan is charged by superceding indictment with two counts of
bringing in and harboring aliens and two counts of transporting aliens in violation of
8 U.S.C. §§ 1324.[1] A motion to suppress filed by Morgan was the subject of an
evidentiary hearing on October 20, 2011.[2] Testifying for the government were Air
Interdiction Agent Catherine Evans, Detective Lance Guidroz of the St. Landry Parish
Sheriff's Department K-9 Unit, and Immigrations and Customs Enforcement Agent
Erol Catalan.  The defendant offered the deposition testimony of his co-defendant,
Luis Leonel Fuentes-Cardona, the report of investigation of the Department of
Homeland Security, and a cash receipt explained below.  For the following reasons,
the undersigned recommends that the motion be granted.

---

[1]     Rec. Doc. 56.

[2]     Rec. Doc. 69.

*Facts in Evidence*

According to Agent Evans's testimony, while off duty on February 21, 2011, she received a telephone call from an unidentified source at the airport in Victoria, Texas.[3]  The source told her that an aircraft bearing tail number N713MT, had departed Victoria en route to Opelousas, La.[4]  There were people aboard the aircraft who were "acting strangely," smelled like marijuana, and when the pilot purchased fuel for the plane, he paid cash for it.[5]  The source further advised that the aircraft had landed at Victoria on the previous day with four passengers, two males and two females.[6]  The two females were dropped off, the aircraft flew to McAllen, Texas, and when it returned to Victoria, there were two Hispanic males aboard.[7]  The parties spent the night in Victoria and the aircraft departed for Opelousas at about 10 a.m. the following day with the pilot and the five passengers.[8]  The source did not say if the

---

[3]     Transcript pp. 5-6.

[4]     *Id.*

[5]     Transcript p. 6.

[6]     Transcript pp. 7-8.

[7]     *Id*.

[8]     Defendant's Ex. 2.

occupants smelled like marijuana when they arrived on the 20th or when they left on the 21st nor did the source ever describe what was meant by "acting strangely."[9]

Agent Evans testified that the government uses the Victoria airport as a fueling location, and at some point in the past, she dropped off a card and asked for anyone to contact her if they saw any suspicious activity.[10]  However, Agent Evans did not know whether the source who called her was the individual to whom she gave her card, and had no information to verify the reliability of the caller or his information other than to verify the itinerary given to her.[11]  Although there was no other information indicative of drug or illegal alien smuggling received from the source,[12] she became suspicious that the aircraft and its occupants may have been involved in smuggling marijuana and/or illegal aliens, so she wanted to check the aircraft upon landing in Louisiana to see if everything was "on the up and up."[13]

Agent Evans testified that she and two other agents embarked on an aircraft to follow the Morgan aircraft to its destination in Opelousas.[14]  She contacted the Air

---

[9]    Transcript p. 23.

[10]   Transcript p. 7.

[11]   Transcript pp. 18-20.

[12]   Transcript pp. 23-24.

[13]   Transcript pp. 8-9.

[14]   Transcript p. 9.

and Marine Operations Center in California and determined that they would not be able to overtake the Morgan aircraft or be there at the time of its arrival as their aircraft was about 5-10 minutes behind.[15]  As a consequence, she asked the Air and Marine Operations Center to contact the St. Landry Parish Sherif's Department to provide personnel and K-9 assistance.[16]  Agent Evans testified that all she told Air and Marine was what her source had told her, to-wit, there were people "acting strangely," who smelled like marijuana, and there were possibly two illegal aliens aboard, which she surmised based on the presence of the two Hispanic males picked up in McAllen, Tx.[17]

At the time Agent Evans arrived at the Opelousas airport, the pilot and passengers were all out of the plane and seated on the ground in handcuffs. [18]  They were situated so that they could not speak to each other and at least one law enforcement officer from the St. Landry Parish Sheriff's Department or other law enforcement agency was adjacent to each person.[19]  Detective Guidroz testified that he was informed the law enforcement officers, with weapons drawn, had ordered the

---

[15]     Transcript p. 9.

[16]     Transcript pp. 34-35.

[17]     Transcript p. 35.

[18]     Transcript pp. 9-10.

[19]     Transcript pp. 9-11.

occupants out of the plane and onto the ground where they were handcuffed.[20]  This was corroborated by Fuentes-Cardona who testified law enforcement officers, with their weapons drawn shouting that they were going to shoot, ordered the occupants out of the plane and to lay face down on the tarmac where they were handcuffed with their hands behind their backs before any questions were asked.[21]  Agent Evans testified that, based on the information she had, it would not have been her practice to place the pilot and passengers in handcuffs in the manner she observed when she arrived.[22]

Without advising Morgan of his *Miranda* rights, she questioned him as to his flight itinerary and whether the two Hispanic males were legally in the country.[23] Morgan responded that they were not.[24]  Fuentes-Cardona testified that, while he was handcuffed on the ground  at the airport, a "lady" law enforcement officer who got out of another plane that had just landed, asked him whether he was in the country

---

[20]     Transcript p. 42.

[21]     Defendant's Ex. 3, pp. 16-17.

[22]     Transcript pp. 26-27.

[23]     Transcript pp. 27-30.

[24]     Transcript p. 30.

illegally and he responded that he was.[25]  He was asked if there were any drugs on the airplane and he said no.[26]

Morgan's handcuffs were removed and he  was instructed to remove all the bags from the aircraft.[27]  At about that time Detective Guidroz, arrived on scene in his K-9 unit.  Agent Evans asked Morgan if they could run the K-9 around the plane, and Morgan stated that they could.[28]  The dog alerted positive on the starboard side of the aircraft behind the pilot's seat.[29]  It is not clear whether Agent Evans or Detective Guidroz asked Morgan if they could search the plane, but Morgan  responded with an oral consent.[30]  Agent Evans testified that her report indicates a consent form was executed by Morgan, however, she didn't remember being present when he signed it and could not find it, therefore, there is no consent form in the record.[31]  The search

---

[25]     Defendant's Ex.3, p. 14.

[26]     Defendant's Ex. 3, p. 17.

[27]     Transcript pp. 12-13.

[28]     Transcript pp. 30, 39-40.

[29]     Transcript pp. 40-41.

[30]     Transcript p. 14.

[31]     Transcript pp. 14-15.

of the aircraft, bags and passengers revealed only a "personal use" amount of marijuana in the possession of one of the non-Hispanic passengers.[32]

The occupants were taken to the Narcotics Division Office located at the front of the airport where they were interviewed by Agent Catalan and one of his colleagues about two hours later.[33] According to Agent Catalan, Morgan was advised of his *Miranda* rights, acknowledged that he understood them and verbally agreed to answer questions; however, Morgan did not agree to sign a *Miranda* waiver form.[34] Agent Evans was present but did not ask questions in the initial interview.[35]

During the initial interview, Morgan stated that he "figured" the two Hispanic males were illegal but did not know.[36] He stated that, on the referral of a friend in Florida who was from Guatemala, he had gone to McAllen to pick them up to work on some specialty equipment that he had.[37] One of the other passengers, who

---

[32]     Defendant's Ex. 2, p. 2, Transcript pp. 12-15.

[33]     Defendant's Ex. 2, p. 2, Transcript pp. 51-52.

[34]     Defendant's Ex. 2, p. 2, Transcript p. 50.

[35]     Transcript p. 60.

[36]     Transcript pp. 52-53, Defendant's Ex. 2.

[37]     *Id*.

possessed the marijuana, was a friend along for the ride who had invited the two females.[38]

Agent Catalan and his colleague then interviewed some of the other occupants. One of the females admitted smoking marijuana with one of the passengers and Morgan on the way to Victoria, however, she did not know if the Hispanic men were illegal.[39]   Agent Catalan testified that Tucker Colomb, the individual who was in possession of the marijuana, "did not seem to be in his right mind" and "was just giving stories all over the place."[40]

Then the agents interviewed Fuentes-Cardona who was read his *Miranda* rights by an interpreter and agreed to answer questions.[41]  Fuentes-Cardona admitted he was a Guatamalan, who was illegally in the country and who had previously been deported.[42]   According to Catalan's report, Fuentes-Cardona said he contacted Morgan about a month earlier and asked if he would pick Fuentes-Cardona up and bring him to Louisiana if he were able to get back across the border to which Morgan

---

[38]     Defendant's Ex. 2; Transcript p. 54.

[39]     Transcript p. 55.

[40]     *Id.*

[41]     Defendant's Ex. 2, p. 2.

[42]     *Id.*

agreed.[43]   Fuentes-Cardona testified that his brother-in law had already gotten him across the border where he and a companion decided to use the services of a "coyote".[44]   Once in Texas, the coyote wanted to charge the men more money than they had, and because the coyote was beating people who could not or would not pay more, fearing for his life, Fuentes-Cardona begged the coyote for some time to get the additional money.[45]   According to Fuentes-Cardona, he contacted a friend who worked for Morgan who, in turn,  got the money to secure his and a companion's release from the coyote.[46]  Morgan picked up Fuentes-Cardona and his companion in McAllen the day after they were released by the coyote.[47]  Fuentes-Cardona  never saw anybody smoking marijuana and knew nothing of it.[48]

After interviewing the other occupants, Agent Catalan and his colleague returned to Morgan to confront him with the information they had learned from the others.[49]   At that point, Morgan admitted smoking marijuana on the flight to

---

[43]        *Id*.

[44]        Defendant's Ex. 3, p. 9.

[45]        Defendant's Ex. 3, p. 11, Defendant's Ex. 2 p. 2.

[46]        Defendant's Ex. 3, pp. 11-12.

[47]        Defendant's Ex. 3, p. 13.

[48]        *Id*., Defendant's Ex. 2, p. 3.

[49]        Transcript p. 57.

Victoria.[50] Agent Evans testified she then asked Morgan how would he feel if he got his pilot's license revoked for smoking marijuana while flying and Morgan became visibly upset.[51]   Morgan admitted that he knew that Fuentes-Cardona had been previously deported.[52]  He admitted he had been contacted by Fuentes-Cardona who asked if Morgan would be willing to pick up Fuentes-Cardona and a friend in Texas if they could get across the border.[53]  Morgan agreed.  Morgan also admitted that he was asked to provide additional money to Fuentes-Cardona.[54]  Morgan stated that his wife assisted in getting money wired to Mexico which was used to obtain the release of Fuentes-Cardona and his companion, and once they were released in Texas, he picked them up at the McAllen airport.[55]

_Contentions of the Parties_

Morgan contends that the warrantless arrest was illegal because the detaining officers had no probable cause for the arrest.  He also contends that the warrantless

---

[50]     Transcript pp. 16, 57.

[51]     Transcript p. 17.

[52]     Transcript p. 58, Defendant's Ex. 2.

[53]     Defendant's Ex. 2.

[54]     Defendant's Ex. 2.

[55]     Transcript pp. 58-59, Defendant's Ex. 2, p. 4.

search of the airplane and the airplane's passengers was illegal because there was no probable cause for the search.  He seeks to have all of the evidence seized as a result of the arrest and the search of the airplane and passengers suppressed.

The government contends that Morgan's motion to suppress was not timely filed and should, for that reason, be denied.  The government also contends that the law enforcement officers who met the airplane at the Opelousas airport "did exactly what they should have done."[56]  The government further contends that a warrantless search is permissible when consent is validly and voluntarily given, and since Morgan consented to the search, that abrogated the need for a showing of probable cause, and mandates denial of the motion to suppress.

*Analysis*

On the procedural issue, the record will reflect that leave was sought, and obtained, to file the motion out of time. According to the court's order of August 30, the motion filing deadline was September 14, 2011.[57] On September 21, Morgan sought leave to file the motion out of time because his attorney had to have two surgical procedures; one on September 9 and one on September 16.[58]   Defense

---

[56]     Rec. Doc. 73 at 3.

[57]     Rec. Doc. 65.

[58]     Rec. Doc. 70.

-11-

counsel is a solo practitioner, and given the seven day delay, the lack of any prejudice to the government and good cause shown, the undersigned granted the motion. This contention is without merit.

Morgan's contention is that the warrantless arrest was illegal because there was no probable cause for the arrest. The undersigned agrees. A law enforcement officer's questioning of a person does not automatically constitute a Fourth Amendment seizure. Such an encounter is consensual so long as a reasonable person would feel free to disregard the police and go about his business. If a reasonable person would have believed that he was not free to leave, then the police will be found to have seized the individual.[59] Pertinent to the instant case, when an officer, by means of physical force or a show of authority, has in some way restrained the liberty of a citizen, a seizure has occurred.[60]

An officer may briefly detain a suspect for questioning without probable cause if the officer has a reasonable suspicion, based on objective facts, that the individual

---

[59]     See, e.g., *United States v. Hernandez-Reyes*, 501 F.Supp.2d 852, 856-57 (W.D. Tex. 2007), citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991), *California v. Hodari D.*, 499 U.S. 621, 628 (1991), *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988), and *INS v. Delgado*, 466 U.S. 210, 216 (1984).

[60]     *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968).

is involved in criminal activity, however, a warrantless  arrest is constitutionally sound only if the arresting officer has probable cause for the arrest.[61]

In this case, the show of force by the St. Landry Parish law enforcement officers was formidable. They met Morgan's plane with weapons drawn threatening to shoot. They ordered the occupants out, placed them face down on the tarmac and handcuffed them. After they were handcuffed they were allowed to sit on the tarmac separated from each other, immediately adjacent to an armed law enforcement officer until the air interdiction agents arrived.  This show of force would make any reasonable person believe that he was not free to leave.  The circumstances indicate that there was sufficient restraint on the freedom of movement of the airplane's passengers to constitute an arrest and the undersigned so finds.  This was, therefore, a warrantless arrest, and the government bears the burden of proving that it had probable cause to seize the airplane occupants.[62]   The undersigned finds the government has not borne that burden.

It is well settled in this circuit that:

"Probable cause exists when the totality of facts and circumstances within a police officer's knowledge **at the moment of arrest** are sufficient for a reasonable person to conclude that the suspect had

---

[61]    *Ibarra v. Harris County*, 243 Fed. App'x 830, 833-34, (5Th Cir. 2007) citations omitted.

[62]    *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993).

committed or was committing an offense." *United States v. Ramirez*, 145 F.3d 345, 352 (5th Cir.1998). The police officer's knowledge must establish that there was a " 'fair probability' that a crime occurred." *United States v. Garcia*, 179 F.3d 265, 269 (5th Cir.1999). "[T]he requisite 'fair probability' is something more than a bare suspicion, but need not reach the fifty percent mark." *Id.* "When considering what a 'reasonable person' would have concluded, we take into account the expertise and experience of the law enforcement officials." *Id. at 268.*

*United States v. Nunez-Sanchez,* 478 F.3d 663, 666-667 (5th Cir. 2007)(emphasis added).

Determining whether probable cause exists requires a practical, common-sense analysis of the circumstances, including information obtained from an informant, if any, to decide if the circumstances establish a fair probability that contraband or evidence of a crime will be found in a particular place.[63]

The totality of the circumstances reveals that the officers of the St. Landry Parish Sheriff's Department did not have  probable cause to arrest Morgan and the passengers on his plane.  Agent Evans testified that all she informed the Air and Marine Operations Center was that she needed a K-9 and personnel assistance to detain the occupants in Opelousas until they arrived.[64]   She also advised them that a source contacted her and said individuals at the Victoria airport were acting

---

[63]     *United States v. Steele*, 353 Fed. App'x 908, 909-910 (5th Cir. 2009); *United States v. Reyes*, 792 F.2d 536, 539 (5th Cir. 1986).

[64]     Transcript p. 35.

strangely, smelled like marijuana, that there were "possibly two illegal aliens" (which she surmised from the report of the two Hispanic males) and they needed to make sure everything was "on the up and up."[65]   Although nobody from the Sheriff's Department who participated in the actual arrest testified, according to Agent Evans this was the only information that would have been in the possession of the Sheriff's Department at the time of the arrest.   However, even if all of the information in the possession of Agent Evans is imputed to the Sheriff's Department, it still does not rise to the level of probable cause as she candidly admitted.

The evidence presented was that Agent Evans received an anonymous tip from someone at the Victoria, Texas airport whose reliability she could not verify other than to verify the itinerary.[66]   This source reported that the passengers on Morgan's airplane were "acting strangely," but neither Agent Evans nor the source clarified what actions constituted "acting strangely," what that description meant or to whom this observation applied.[67]   The source said the plane occupants smelled of marijuana, however, Agent Evans did not know on which day the occupants allegedly smelled

---

[65]     Transcript p. 35.

[66]     Transcript p. 19.

[67]     Transcript p. 26.

of marijuana, the day they arrived, the day they left or both.[68]  The source said the pilot purchased gasoline with cash which Agent Evans testified was a "red flag" that the pilot was trying to avoid a paper trail.[69]  However, the amount of gasoline purchased with cash was a relatively small amount – $155.20[70] –  and there is no evidence that any effort was made by Morgan to destroy the paper trail for the purchase. On the contrary, the receipt introduced into evidence identified the tail number of the plane, the amount of the purchase, and the date and time it was purchased.[71]   From this information, the owner of the plane could be readily identified.[72]  Yet Agent Evans did not identify the owner until she got to the airport in Opelousas.[73]  The source said Morgan dropped off the two women passengers in Victoria, flew to McAllen, then returned with two additional men who appeared to be Hispanic.   Agent Catalan confirmed that there is an Hispanic population in McAllen that is legally in this country.[74]

---

[68]      *Id.*

[69]      Transcript p. 6.

[70]      Defendant's Ex. 1.

[71]      Defendant's Ex. 1.

[72]      Transcript p. 22.

[73]      Transcript pp. 19-20.

[74]      Transcript p. 67.

In *United States v. Hernandez-Reyes*, 501 F.Supp.2d 852, 860 (W.D.Tx. 2007), the court found  a person's physical proximity to a suspected illegal alien, or the fact that a person is engaged in a common task with an illegal alien, does not even rise to the level of reasonable suspicion citing a number of cases for the proposition that "it is certain one cannot make a search or seizure merely based upon the association or propinquity of a person with known or suspected criminals, or solely because of someone's proximity to contraband."[75]

Agent Evans admitted that she would not have proceeded in the manner chosen by the St. Landry Parish Sheriff's Department unless she had probable cause.[76]  She further admitted that, based on the information she had at the time, if she had come into contact with the occupants of the aircraft, she would not have ordered them off the plane at gunpoint, ordered them on the ground and put handcuffs on them absent an officer safety issue.[77]   Instead, she would have waited for the passengers to disembark, identified herself, and then begin asking for credentials, etc. [78] Accordingly, the undersigned finds that Morgan's arrest was made without probable

---

[75]     Citations omitted.

[76]     Transcript p. 26.

[77]     Transcript p. 27.

[78]     *Id.*

-17-

cause, in violation of the Fourth Amendment, when he was arrested by the St. Landry Parish Sheriff's Department at the Opelousas airport on February 21, 2011.[79]

Morgan was questioned by law enforcement officials, including Agent Evans, following the arrest without having been apprised of his *Miranda* rights.  During this questioning, he allegedly admitted that he knew that the two Hispanic males were not legally in this country.[80]   A law enforcement officer is obligated to administer *Miranda* warnings when there has been such a restriction on a person's freedom as to render him in custody.[81]   Determining whether an individual is "in custody" requires an examination of the circumstances surrounding the interrogation but ultimately depends upon whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.[82] The undersigned has

---

[79]       See *United States v. Olivares-Pacheco* 633 F.3d 399 (5th Cir 2011) where the court provided a number of historical illustrations of what constitutes, and does not constitute, **reasonable suspicion** to effect temporary detention for investigatory purposes in cases involving transportation of illegal immigrants. While distinguishable in that the eight factors applied in those types of cases are not particularly applicable in the instant case, the cases cited and discussed are illustrative of the weakness of the grounds asserted for **probable cause** to arrest in the instant case.

[80]       Transcript pp. 29-30.

[81]       *Stansbury v. California*, 511 U.S. 318, 322 (1994), citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

[82]       *Stansbury v. California*, 511 U.S. at 322, citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983).

already found there was an arrest, and therefore, the undersigned finds *Miranda* warnings should have been administered before any questioning.

A statement obtained in violation of *Miranda* creates a presumption that the defendant's Fifth Amendment right against self incrimination has been violated.[83]  A statement obtained in violation of *Miranda* may be suppressed on that basis alone since the exclusionary rule "sweeps more broadly than the Fifth Amendment itself. [and] It may be triggered even in the absence of a Fifth Amendment violation."[84] The undersigned concludes the statements made by Morgan after his illegal arrest without being given *Miranda* warnings were obtained in violation of his Fourth Amendment rights and the *Miranda* rule. Therefore, the undersigned recommends those statements be suppressed.

With regard to the search following the arrest, the government contends it was consensual, and therefore, probable cause was not required. The undersigned disagrees. Where, as here,:

> ...a request for consent is preceded by an illegal search or seizure, a different analysis applies. '[I]f an individual gives consent [to search] after being subject to an initial unconstitutional search, the consent is valid only if it was an independent act of free will, breaking the causal chain between the consent and the constitutional violation.'

---

[83]     *Oregon v. Elstad*, 470 U.S. 298, 307, 105 S.Ct. 1285, 1292 (1985); *United States v. Cherry*, 794 F.2d. 201, 207 (5th Cir. 1986).

[84]     *Elstad,* 470 U.S. 306, 105 S.Ct. 1292; *Cherry,* 794 F.2d 207.

*United States v. Hernandez,* 392 Fed.Appx. 350,352 (5th Cir. 2010) citing *United States v. Gomez-Moreno,* 479 F.3d 350, 357 (5th Cir. 2007).

The "independent act of free will" analysis requires the court to consider three factors: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct.[85]

There was very little time between the occupants being handcuffed, face-down on the tarmac, at gunpoint and the consent to search. The only intervening circumstances were the arrival of more law enforcement officers in the form of Agent Evans, her colleagues, Detective Guidroz and the K-9, and the obtaining of inculpatory statements without giving *Miranda* warnings. According to Agent Evans, before the search by law enforcement officers, Morgan had been required to get the baggage from the plane and place it next to the occupants before the K-9 alerted.[86] The undersigned finds there was a temporal proximity between the conduct and the consent and there were no intervening circumstances to break the chain of causation between the constitutional violation and the consent. Finally, as Agent Evans

---

[85]     *Hernandez,* 392 Fed.Appx. at 353 citing *United States v. Hernandez*, 279 F.3d 302, 307 (5th Cir. 2002).

[86]     Transcript pp. 12-13.

admitted, the actions taken by the Sheriff's Department personnel without probable cause were not the practice and procedure she would have followed. The seizure of the occupants was, at a minimum,  forceful and threatening. The undersigned finds that all factors weigh in favor of Morgan. Absent the illegal search, the marijuana and the evidence derived from finding the marijuana would not have been discovered. Therefore, the undersigned concludes the consent was not voluntary and recommends the evidence seized as a result of the search of the aircraft, the marijuana and the statements pertaining to its use,  be suppressed.

As Morgan's initial statement was obtained after his illegal  arrest and without having been given *Miranda* warnings it should be suppressed.  However, Morgan gave another statement while in custody after he was given *Miranda* warnings. Therefore, the issue is whether the illegal arrest and/or *Miranda* violation is sufficient to require suppression of all of his statements, or whether the illegal arrest and/or *Miranda* violation did not so taint the second "post-*Miranda*" confession as to render it involuntary.

Having found there was no probable cause for the arrest and that Morgan's Fourth Amendment rights were violated when he was illegally seized, the statements

obtained as a result of the illegal arrest can be excluded under the fruit of the

poisonous tree doctrine notwithstanding a *Miranda* warning.[87]

> The *Wong Sun* doctrine applies as well when the fruit of the Fourth
> Amendment violation is a confession. It is settled law that "a confession
> obtained through custodial interrogation after an illegal arrest should be
> excluded unless intervening events break the causal connection between
> the illegal arrest and the confession so that the confession is 'sufficiently
> an act of free will to purge the primary taint.' " *Taylor v. Alabama*, 457
> U.S. 687, 690, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982) (quoting
> *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d
> 416 (1975)).

*Elstad,* 470 U.S. at 306.

"[T]he fundamental issue is. . . whether the effect of the illegal arrest has so

dissipated that . .  consent. . . [is] 'sufficiently an act of free will to purge the primary

taint'. . .  The central inquiry regarding the dissipation of the taint of the illegal arrest

is the voluntariness of the consent...Voluntariness is 'determined by the totality of all

the circumstances.'"[88]

In addition to the Fourth Amendment issue, the violation of *Miranda* only

creates a  presumption that the defendant's Fifth Amendment rights have been

---

[87]     *Wong Sun v. United States,* 371 U.S. 471, 485-486 (1963).

[88]     *Cherry,* 794 F.2d at 205 citing *Brown v. Illinois,* 422 U.S. 590, 602, 604 (1975),
*Taylor v. Alabama*, 457 U.S. 687, 690 (1982) and *United States v. Mendenhall*, 446 U.S. 544, 557
(1980).

violated.[89]   If the unwarned statement was so involuntary or coerced, such that the

defendant's  Fifth Amendment right against self incrimination was violated, then the

post- warning statements may also be suppressed under the poisonous tree doctrine.[90]

> 'A mere violation of Miranda's 'prophylactic' procedures does not trigger the fruit of the poisonous tree doctrine. The derivative evidence rule operates only when an actual constitutional violation occurs, as where a suspect confesses in response to coercion.' *United States v. Barte*, 868 F.2d 773, 774 (5th Cir.), cert. denied, 493 U.S. 995, 110 S.Ct. 547, 107 L.Ed.2d 543 (1989) (citing *United States v. Bengivenga*, 845 F.2d 593, 601 (5th Cir.), cert. denied, 488 U.S. 924, 109 S.Ct. 306, 102 L.Ed.2d 325 (1988)). To suppress the derivative evidence, the tactics employed by the officers must be " 'so offensive to a civilized system of justice that they must be condemned.' " *Barte*, 868 F.2d at 774 (quoting *Miller v. Fenton*, 474 U.S. 104, 109, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985)).

*United States v. Mendez*, 27 F.3d at 130.

If obtaining the unwarned statement in violation of *Miranda* does not constitute

a Fifth Amendment violation, the post-warning statements may still be inadmissible.

Where, as here, there is no indication of a "deliberate two-step strategy," whether the

post-warning statements are admissible is based on the principles of *Oregon v. Elstad*

rather than *Missouri v. Seibert*.[91]   A two-step strategy is when an interrogator relies

---

[89]        *Elstad,* 470 U.S. at 307*; Cherry,* 794 F.2d at 207.

[90]        *United States v. Mendez,* 27 F.3d 126, 130 (5th Cir. 1994).

[91]        *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006) citing *Missouri v. Seibert*, 542 U.S. 600, 622 (2004); *United States v. Nunez-Sanchez*, 478 F.3d 663, 668 (5th Cir. 2007).

on "the defendant's  prewarning statement to obtain the postwarning statement . . .[by] confront[ing] the defendant with her inadmissible prewarning statements and push[ing] her to acknowledge  them."[92]   There is no evidence that Agent Catalan employed such a strategy and the defendant has not alleged that such a strategy was employed.  Therefore, *Seibert* does not apply.

The inquiry under *Elstad* is whether the second statement was voluntarily made by examining the "surrounding circumstances and the entire course of police conduct with respect to the suspect." [93]   Key to this analysis would seem to be whether both the pre-warning statement, and post-warning statement, were voluntary.[94]  As the *Elstad* Court held: "We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings."[95]  However, the *Elstad* court recognized that a coerced pre-warning statement may not be enough to suppress a post-warning statement:

---

[92]     *Seibert*, 542 U.S. at 621.

[93]     *Elstad*, 470 U.S. at 318; *Nunez-Sanchez*, 478 F.3d at 669.

[94]     *Elstad,* 470 U.S. at 314, 318; *Nunez-Sanchez,* 478 F.3d at 668-669;  *United States v. Hernandez,* 200 Fed.Appx. 283, 287 (5th Cir. 2006).

[95]     *Elstad*, 470 U.S. at 318.

> When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession. See *Westover v. United States*, decided together with *Miranda v. Arizona*, 384 U.S., at 494, 86 S.Ct., at 1638; *Clewis v. Texas*, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967).

*Elstad,* 470 U.S. 310.

Thus, the court must consider three questions - (1) whether the "taint" from the illegal arrest had "dissipated" such that the post-warning statement was voluntary; and if so, (2) whether the first unwarned statement was so involuntary as to rise to the level of a Fifth Amendment violation that the post-warning statement should be suppressed under the poisonous tree doctrine, and if not (3) whether the waiver of the *Miranda* rights at the time of the second statement was voluntary even if the first statement was coerced.[96]

The evidence is not disputed that the occupants were ordered out of the plane at gunpoint, ordered to lay face down on the tarmac, handcuffed, then allowed to sit, separate from each other, with uniformed law enforcement officers adjacent to them. These same officers had threatened to shoot if the occupants did not obey the orders. The statement made by Morgan was made within minutes of these events without *Miranda* warnings or Morgan being told he was formally under arrest. The

---

[96]     *Hernandez,* 200 Fed.Appx. at 287.

-25-

undersigned finds the first statements were not voluntary and were coerced, at a minimum, by intimidation.

After the illegal seizure and search, the occupants were moved to the Narcotics Division Office in the front of the airport where they were questioned by Special Agents Bison and Catalan.[97]  Based on the report of investigation, Agent Evans and her colleagues landed in Opelousas at 12:05 p.m. and the subsequent interview when Morgan was advised of his *Miranda* rights began just before 2:00 p.m.[98]  Therefore, approximately two hours had elapsed from the time of the illegal arrest/search and the subsequent interview. Morgan was given his *Miranda* warnings, and although he gave a "verbal" acknowledgment, he did not sign an advice of rights form.[99] According to Agent Catalan, Morgan was not handcuffed, he had been separated from the other passengers, and although he was "scared" and "nervous," he was cooperative.[100]  While Agents Bison and Catalan were doing most of the questioning, they did not know Morgan had been questioned by Agent Evans in violation of his *Miranda* rights, nor were they made aware of the circumstances of his arrest or the

---

[97]     Defendant's Exhibit 2, p. 2.

[98]     *Id.*

[99]     Transcript pp. 50-51.

[100]     Transcript pp. 50-51, 57.

search.[101] Morgan initially denied using marijuana and said he did not know the two
Hispanic males were illegal but "figured they were."[102] However, after the other
occupants had been interviewed and Morgan admitted he smoked marijuana, Agent
Evans asked Morgan how he would feel if he lost his pilot's license because he used
marijuana.[103] At that point Morgan became "visibly upset" and confessed
"everything."[104]

     The undersigned finds that, armed with the knowledge and evidence obtained
from the illegal arrest and search approximately two hours earlier, Agent Evans was
able to prompt the full confession.  The undersigned further finds, since they were not
made aware of the circumstances of the arrest and subsequent search, Agents Catalan
and Bison did not take any "curative" measures to insure the second statement was
voluntary.

The intervening events were not sufficient to break the causal connection between the
illegal arrest/search and the subsequent confession and the government has not
carried its burden to show that the second statement was voluntary.

---

[101]    Transcript pp.60-61, 64.

[102]    Transcript pp. 52-53.

[103]    Transcript pp. 16-17.

[104]    Transcript pp. 17, 57-58.

While the undersigned does not find that a Fifth Amendment violation occurred when the first statement was obtained, the undersigned does find that the post-warning statements should be excluded under the poisonous tree doctrine as a result of the Fourth Amendment violations, i.e. the arrest and the search. In addition, the undersgined finds the first statement was coerced, and applying the factors of *Oregon v. Elstad*, that coercion carried over to the second confession.   Therefore, the undersigned recommends that the statements obtained from Morgan during his interviews in the Narcotics Division Office be excluded.

Finally, there were statements obtained from Fuentes-Cardona in the same manner, i.e. while handcuffed on the ground without receiving *Miranda* warnings, and after he received *Miranda* warnings in the Narcotics Division office.[105]

According to the U. S. Supreme Court:

> The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion. It follows from our holding in *Silverman v. United States*, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734, that the Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of 'papers and effects.' . . . Thus, verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion.. . . See *Nueslein v. District of Columbia*, 73 App.D.C. 85, 115 F.2d 690. Nor do the policies

---

[105]    Defendant's Ex. 2, pp. 3-4, and Ex. 3 p. 17.

underlying the exclusionary rule invite any logical distinction between physical and verbal evidence. Either in terms of deterring lawless conduct by federal officers, *Rea v. United States*, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233, or of closing the doors of the federal courts to any use of evidence unconstitutionally obtained, *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669, the danger in relaxing the exclusionary rules in the case of verbal evidence would seem too great to warrant introducing such a distinction.

*Wong Sun v. United States,* 371 U.S. 471, 485-486 (1963).

Morgan cannot assert the violations of any Constitutional rights held by Fuentes-Cardona as he has no standing to do so.  However, the statement obtained from Fuentes-Cardona while he was handcuffed on the ground falls within the *Wong Sun* doctrine as it "derives so immediately" from the unlawful arrest of Morgan. Therefore, the undersigned recommends that statement also be excluded.

## *Conclusion and Recommendations*

For the reasons set forth above, the undersigned concludes that the defendant's Fourth Amendment rights were violated when he was subjected to an illegal arrest and search. The undersigned further concludes that the initial statement obtained from Morgan was obtained in violation of the *Miranda* rule.   Accordingly, It is recommended that defendant Monty Morgan's motion to suppress (Rec. Doc. 69) be

-29-

granted, and that all of Mr. Morgan's statements of February 21, 2011 be suppressed as fruits of the illegal arrest. It is also recommended that all of evidence seized as a result of the search of his plane on February 21, 2011 be suppressed as the fruits of an illegal search.  Finally, it is recommended that the statement of Fuentes-Cardona made at the time of the illegal arrest of Morgan be suppressed.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415

(5th Cir. 1996).

    Signed at Lafayette, Louisiana, this 8th day of December 2011.

Patrick J. Hanna
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)